1580 Pfizer Incorporated v. Ajix Incorporated Mr. Wadowski Good morning. May it please the Court, I'm James Wadowski. On behalf of Appellant Pfizer with me is Chris Milliken. I've reserved three minutes for rebuttal. For the purposes of the literal infringement analysis, the parties crystallized one issue in their briefing to the District Court below. And that was whether or not the structural limitation of at least one indentation within the meaning of Claim 1 needed to have read into it an additional structural limitation that that indentation could not also serve as a second engagement area for the counter-locking ring. And that is what we briefed below. In demonstrating the legal error of the District Court, you have to address two things. One is that she erred in failing to address that central issue. And two, that in the claim construction and resulting infringement analysis she fashioned on her own initiative, she resulted in an untenable conclusion. To establish those things today, I want to make three points. I want to first demonstrate for you why the District Court's analysis cannot support affirmance. Second, I want to show you that she failed to consider Pfizer's construction of the asserted claim, under which, in an appropriate construction of Claim 1, there is no basis to conclude that there's no literal infringement. And third, to discuss with you that no other grounds urged by Ajax below could otherwise support a finding of non-infringement on summary judgment. And so taking those in turn, I would say you have to look at ultimately the one paragraph where the District Court concludes that there is no literal infringement because the Pfizer-optimized capsule taught in the 267 patent has two separate areas on the body wall. One, a pre-lock area, and one, an engagement area. And she says that there's no literal infringement because the accused capsule has only one area. So the question becomes, what did she mean by separate in that two separate areas? You can take only two possible readings of it. The first is a more narrow construction of it, which means that they are located separately in different areas on the body wall, in which case there's no overlap. And I would suggest to you that neither party ever submitted that proposition. Ajax cannot stand behind it. And it would be legally untenable because there's absolutely no extrinsic source that you can cite as a reference or authority for that proposition. What about the language of the claim itself that talks about a first pre-lock area and the separate engagement area? Those are defined separately, separate areas, not just separate structures, but separate areas. That's right. They are separate areas for the purposes of discussing the functional limitations within the claim. But there is nothing in the claim language or in the intrinsic record that would suggest to you that they cannot be coterminous or that they must not overlap. Ajax never said it. We never said it. As a matter of fact, as our experts said, Your Honor, that there is some engagement in the pre-lock position with that ring 15. So you're saying something that is in the same area can nonetheless read on a claim that describes two separate areas? That's right, Your Honor. What we're saying is if you look at the claim language and the specification, it is a very simple construction analysis. You look at the body wall. It calls out two areas, pre-lock and engagement. In the pre-lock area, there is a structural limitation and a functional limitation. It must have an indentation, and that indentation must engage with the first pre-lock area. With the second engagement area, there is only the functional limitation that it must engage with the first engagement area on the cap. But whatever structure it is that performs that function would, as called for in the claim, be in a separate area. Is that right? That's right, Your Honor. And so it begs the question, how do we define separate? And if I understand your question correctly, I'm back to you. Does that mean that can you read that to foreclose the possibility that one structure can perform the function in both areas? And I would submit neither party said that it's a circumstance where there's a physical separation between the areas, which I would think from the Court's questions at oral argument, that's actually what she believed. What we are saying, the dispute ultimately came down to that Ajax wanted the holding ring, which they claim is the indentation involved in the pre-lock connection. They wanted it to be locking ring 15 plus taper 21. And our dispute with that was we were saying that 21 refers to the second pre-lock area, which is the area on the body wall that fits the protrusions during the engagement, and that 15, the ring structure 15, is necessarily included in that area. That was the debate. What the Court seems to have said by referring to that one passage in column 3 of the patent is that she finds three separate rings. No one disputes that that first ring called out is the locking ring 15. No one disputes that the next ring is the Connie ring 16, which is immaterial to the present appeal. But the question was always, what do you mean by that third separate ring? She seems to suggest, which neither party submitted, that it's a wholly separate ring structure. The question really is whether she's right or wrong. You said about four times neither party submitted something. Maybe she thought both parties were wrong. Her obligation is to decide, and then we're supposed to review it. Our Court, in its wisdom, says it's a matter of law. She does it, and now we do it. That's right. That's right, Your Honor. So it doesn't really matter whether either one of you or both of you told her what to say or think. Exactly right, Your Honor. So you look at her analysis, and you say that's getting back to my point. There's only two ways to construe separate as she uses it in her holding and her findings. One is to say that there is no physical overlap between the areas, which is, as I say, she doesn't cite any passage which says that, and I would submit there is no authority for that proposition, so it's legally untenable. If she says that they can be coextensive with some overlap but just not coterminous, that's just plainly contradicted by the record evidence you have before it. Our expert says that there is some sort of engagement between 15 and 21, and Ajax has never disputed that. The Court has never disputed that. So I suggest that. Well, those are facts. And once again, this Court says there's no factual issue here. That's right, Your Honor. So what I'm saying is you keep talking about extensive evidence, and your experts are saying, and nobody found otherwise, and so forth. I mean, you're going to pickle, but I mean, this Court says that's irrelevant. This Court says this is irrelevant. The question is whether or not it's actually cited to any authority which would support its conclusion such that there are no disputed facts that would entitle her to say that a grant of no literal infringement should be given to Ajax. And I'd suggest that she has not done that. That's what I'm saying. There is nothing. Her sole citation to the patent is Column 3, and it does not stand for the proposition for which she cites it. It does not call out a separate ring structure as a morphological structure. What it does is it identifies element 15, element 16, and then it goes on to say the wider ring, which is element 21, which, as we said, is a cylindrical cutaway, which shows you that area of the body wall identified by element 21, which fits the elongated protrusions of the cap when it is in the prelock connection. What about the circular-shaped ring, which is also mentioned in Column 3, lines 54 to 63? Summary of the invention. There are four specific items mentioned there. The locking ring, the counterlocking ring, a circular-shaped ring, and the wider ring, right? That's right, Your Honor. So if, in fact, she relies on that particular passage, how is she wrong? She is wrong because she is saying that that wider ring, that third ring, which is what we're talking about. No, that's fourth. That's the fourth ring in that paragraph. In Column 3, Your Honor? Column 3, lines 54 to 63. Summary of the invention. On the body, there comprises a locking ring, which is 15. A counterlocking ring, which matches a locking ring, and go down a little bit further, formed by a circular-shaped ring with a depth of 10 to 60 microns and a width of 0.8 to 1.4, and then a wider ring of symmetrical or asymmetrical cross-section profile with 50 elongated protrusions. That's right, Your Honor. So is that the wider ring, a fourth ring? No, Your Honor. And the reason is, the locking ring to which you referred at the beginning of that passage is then comma-modified. They say the locking ring is the counterlocking ring on the body. So the locking ring language and then the counterlocking ring, that refers to one structure. So that is one ring. That is element 15 on Figure 1 of the patent. Well, it's both the locking ring and the counterlocking ring are one and the same. That's right, Your Honor. Why is there a comma between the two? Because I believe that the language by last antecedent, the locking ring is explained to be the counterlocking ring involved in the interaction in the permanent lock connection. But the structure then, the grammatical structure is wrong, is it? Well, Your Honor, the only other possible thing you can interpret that to mean then is to say that that is the locking ring on the cap. In any event, it does not call out another structure in any sense of that word on the body at all. So you're saying that they're one and the same. That's right, Your Honor. That is my interpretation. There is no other interpretation that would put four rings on the body under anyone's interpretation. Well, the district court came up with four rings, didn't it? No, Your Honor. She came up with three separate rings. Three separate rings. Three separate rings. Identifiable and distinct. That's right. Based principally on that summary of the invention. Based exclusively, and that's why I'm saying it's a misreading. She calls them out as three separate rings and misinterprets that passage. And I suggest, Your Honor, if that is her sole authority and she has misinterpreted it as a matter of law, she is wrong. So I would suggest to you that that first ring again is 15. Conning ring 16 is the second ring. And we're discussing really what that third ring is. Ajax wants it to be the holding ring, which is somehow element 15 again, but defined now as 15 plus 21. Where in the specification is it defined as 15 plus 21? I say nowhere in the specification is it defined as 15 plus 21. That is Ajax's position. We say that's expressly wrong. The specification seems to refer to it as 21, right? The specification in column 7 refers to the indentation 21 as serving as the second prelock area or the second prelock connection unit. And then if you go, so that calls out. We say column 7 calls that out as it says. 21 is depicted on figure 1 is the second prelock area. And then what we do is we take you to column 9, lines 10 through 24, which read in lay of the claims tells you that this holding ring involved in the prelock connection is ring 15 that can be asymmetric or symmetric in cross profile by changing the arcuate line of the ring such that the end of the ring closer to the closed end of the capsule, the angle changes to make it asymmetric as opposed to symmetric. So what we're saying is the specification primarily as taught in column 9 tells you exactly what the asserted claims claim, and that is column 1 calls out these two areas. Claim 5, which depends from it, says that the indentation 21 is in the embodiment of a holding ring 15 and that that holding ring 15 under claims 7 and 8 can be either cross, can be asymmetric or symmetric in cross sectional profile. So reading that in light of column 9, what you essentially have is you take that one ring that in the permanent lock serves as the counter locking ring, and that is the holding ring, and you make it symmetric or asymmetric by altering that arcuate line on the back end closer to the closed end of the capsule. That's what it teaches. So what we are saying is the preferred embodiment in FISA practices is claim 1, claim 5 to claim 7. The accused capsule is claim 1 to claim 5 to claim 8. And that has always been the analysis. And that was our simple and straightforward proposition, Your Honor. We simply said all— Do you want to save somebody the rebuttal time? You're into it. Yes, yes, I will. Thank you very much, Your Honor. Mr. Shalik. Good morning. I'm James Shalik, appearing on behalf of the Appley Agents. The judgment of non-infringement should be affirmed because there's no dispute concerning the structure of the accused device, and the intrinsic evidence establishes that the claims require a structural feature the accused device does not possess, some area on the body of the capsule which engages protrusions on the cap to create the prelock, and which plays no role in creating the permanent lock. The body of the accused capsule differs from the claimed invention in that it uses precisely the same locking ring to create both the prelock and permanent lock. As did a number of prior art capsules, including prior art of record. This type of engagement is not described in the specification of the 267 patent as the practice of the invention, but rather as a problematic feature of the prior art that the invention overcomes. If we turn to column 11, line 9, there's a discussion there of figure 3. That figure shows the force between the body and the cap of the capsule as a function of their relative displacement when they're pulled apart from the prelocked position. Now, at column 11, line 14, the specification states, prior art capsules show a sharp increase of the required force at 4 millimeters displacement, which may result into separation problems. This is due to the resistance which the protrusions of the known capsules must overcome when passing over the locking ring. In short, the patent says that engaging the protrusions with the locking ring on the body is not part of the invention. It's a feature of the prior art designs that the inventors thought increased the peak prelock force needed to separate the capsule, and the inventors thought was problematic. So under the Simon case and its progeny, when the specification disparages an embodiment and says it's not part of the invention, then it's not part of the invention, and the claim should not be construed otherwise. To solve the resistance and peak force problem created by the movement of protrusions over the permanent locking ring, the patent requires an indentation 21 that is described alternately as a taper or a holding ring, and that structure offers less resistance to the protrusions because it's a shallow, shallower, it's a shallow tapered recess that creates a wider ring that holds the protrusions with less force and creates less resistance. There's not the slightest suggestion anywhere in the patent... Is that to differentiate between the permanent lock and the prelock mechanisms? Is that what it does? Yes, it does, Your Honor. 21 is dedicated to the prelock and 15 is dedicated to the locking ring. To the permanent lock. Correct. And addressing the Court's earlier comments to Counselor Profizer, the summary of the invention absolutely describes four rings. The Court was precisely correct in that. There's a permanent locking ring on the cap. There's a permanent locking ring on the body that matches that. There's an additional ring, a holding ring, that holds the protrusions that's described as wider, and as the District Court pointed out, those correspond to the two different claim elements directed to the prelock area and the permanent engagement area. The fourth ring is the Connie ring, which is at the end of the capsule and not directly relevant to the appeal. Both the abstract and the summary of invention specifically call out a permanent locking ring on the body to engage the counter-locking ring on the cap to create the permanent lock and the wider holding ring to engage the protrusions to create the prelock. Does the wider holding ring encompass both rings 15 and 21? The wider holding ring can be made of 21 or it can be made of a combination of 21 plus 15. The point is that there's always some additional structure, 21, above and beyond what's present on the capsule in the way of permanent locking ring 15. Using permanent locking ring 15 alone is a problematic feature of prior art designs that the specification disclaims as being part of the invention. As the Court noted, the claim language also reflects that the invention contemplates two areas because there are two separate limitations directed to it. The permanent engagement area that's called out in column 12, lines 3 through 9, is the second engagement area, and the prelock engagement area that's called out in column 11, lines 60 through 66. Now, the prosecution history also supports the district court's construction because as originally presented, application claim 15 only recited one engagement area on the body, a prelock engagement area. The examiner rejected that claim and required the addition of structure directed to the permanent lock. Significantly, the applicant did not amend the claim to call for at least one engagement area that could perform two different functions, effectuating the prelock and effectuating the permanent lock. Instead, the applicant amended the claim to require two different engagement areas, one directed to the prelock and one directed to the permanent lock. So they amended the claim to add a requirement for two different structures on the body of the capsule. Now, there's yet another very compelling reason why the judgment of non-infringement should be affirmed, and that's because the Phillips v. AWH decision reaffirmed the longstanding principle that where a claim is susceptible to alternative interpretations, and I will give Fisler an argument, the thought that the claim might be ambiguous, and one of those interpretations renders the claim invalid and the other sustains its invalidity, the claim should be construed so as to sustain its validity. And Phillips also clarified that the strength of that argument turns on the strength of the inference to be taken, that the patent office would not have issued the patent unless the construction favoring validity had been taken. And that's precisely the situation we have here, because Fisler's interpretation where a single permanent locking ring can perform both the prelock and the permanent lock functions leaves claim one anticipated by prior art that's prior art of record, the Graham 678 patent. Second, the German counterpart to this Graham patent is actually described in the background of the invention as representing the state of the art before the invention and cannot be part of the claimed invention as it would be under Fisler's construction. The German equivalent of the Graham patent is DE 1812717, and it's identified in column one at line 34. There's no doubt that the examiner was fully aware that this was the German equivalent of the Graham 678 patent because the file wrapper shows that he ran a family search, and in the appendix at A367, that search appears, and it shows that the Graham 678 was the U.S. counterpart of this German patent described in the background of the invention. At that time, the examiner made the Graham patent prior art of record. Now, also in the appendix at A720-721, there is a claim chart that we served on Fisler early in discovery that shows how claim one is anticipated by the Graham 678 patent under Fisler's construction, and at page 50 of our brief, we reproduced the figures from the Graham patent showing the permanent lock and the prelock, and figure two shows a permanent lock which is comprised of the mechanical fit of a ridge 19 on a cap and a groove 19 on the body in the Graham patent, and figure three shows a prelock created by protrusions, which are called indent means 24, that engage exactly the same groove on the body, 19A, that serves as the permanent locking ring. Now, at page 11 of its reply brief, Fisler makes just two arguments to try and distinguish Graham. The first way Fisler tries to distinguish Graham is by arguing that the protrusions are not quote-unquote elongated, but the Graham patent not only discloses elongated protrusions, it actually claims them. At page A542 in the appendix, we have claim one of the 678 patent, and at column four, line 70, it specifically calls out that the cap wall has an axially elongated indent means, the indent means being the protrusions, so the claim calls out that they are axially elongated. In the same column, at column four, line 31, it says two or more indents with maximum circumferential spacing are preferred, so it's contemplated there will be several protrusions. So the argument that Graham does not have elongated protrusions does not hold up upon an actual inspection of the Graham patent. It clearly discloses them. The second argument that Fisler tries to make is that the prelock of Graham was not engageable in a releasable manner. But if we take a look at the patent suit, the 267 patent, at column one, which appears at A54 of the appendix, starting at line 34 in column one, the German equivalent of the Graham patent is described there, and at line 37, it says that the, well, at line 36, it says that the protrusions are brought into engagement with the taper of the body to provide a, quote, unquote, readily releasable prelock. So Fisler is trying to argue in its brief that the prelock of the Graham 678 is not readily releasable when its own patent characterized it as being exactly that. And this is really the genesis of the argument that Fisler interjected very late into the case about what engageable should mean. Throughout all discovery, engageable meant what the district court said it meant. But after Ajix filed its motion for summary judgment, moving for a finding of non-infringement under Ajix's interpretation and for a finding of invalidity under Fisler's interpretation, such that there was no claim construction under which Fisler could win this case, Fisler came back and said, well, aha, we now think that engageable means there must be less than 21.6 grams of prelock force, and then tried to argue that that was a limitation that could somehow distinguish the prior art but still give it an argument on infringement. And that position is absolutely indefensible. Once you get past the fact that you can't read numerical limitations into the claim, that the word engageable should be construed consistently and is used twice in the claim, once in relation to the permanent lock and once in relation to the leasable lock, and that to take their interpretation would read the words for leasable and permanent out of the claim, just look at what they're trying to say the claim means. They're saying that it includes a limitation of 21.6 grams. That number in the specification doesn't refer to the invention. It refers to what they say is the average force of prior art capsules. The invention refers to supposedly 14.5 grams of prelock force. Both these numbers are average numbers, and the patent gives standard deviations. It says that the prior art 21.6 has plus or minus 8.9 grams of force, and the invention has 14.5 plus or minus 4.1 grams of force. Now, if these are average numbers and Pfizer concedes that there are a large number of capsules within the standard deviation and even past the standard deviation, any one of those capsules is anticipatory because the claimed invention is not a lot of capsules that was manufactured together from which you take some sort of average. It's a capsule. So under their interpretation, how would you even determine infringement? How many capsules would you look to take an average? So their claim interpretation is not only contrived and indefensible. It would be indefinite. It couldn't even be applied. And this is the only real significance of engageable is that they're trying to use that to distinguish Graham, and we say that Graham is one of many factors that drives the claim construction because under Pfizer's interpretation, the claim is anticipated over the Graham art of record, and so they're coming up with this engageable argument to try and argue, no, it isn't. But, in fact, that's not part of the claim, and once you say it's not part of the claim, there's nothing to argue. Under Pfizer's interpretation, the patent office issued an invalid claim, claim one over the art of record. And we know the PTO never does that. Well, we like to think it doesn't happen. So to conclude, the summary of the invention in the abstract identified the pre-lock engagement area that engages the protrusions as one ring and the permanent locking ring that in the permanent lock engagement area as a separate ring. The holding ring that engages the protrusions in the pre-lock is a wider ring than the other locking ring. The specification characterizes the interaction of the protrusions on the cap with the permanent locking ring as a problematic feature of the prior art and not part of the invention. Furthermore, the claim would be invalid over art of record under Pfizer's construction. Thank you very much. Thank you. Mr. Wodawski, you have a couple minutes. Thank you, Your Honor. First, you'll note that counsel for Ajax started off by saying that what they demand is some area in the pre-lock structure, in the pre-lock area, not involved in the engagement area. When you state it like that, we have it, and they infringe because then it would be the uncontoured wall of the body. So I understood their argument below to be that there had to be some structure in that second pre-lock area. But most importantly, what troubled us most in their presentation was their attempt to describe figure three of the patent to you as somehow saying that it discusses the locking ring on the body, that that is the feature of relevance in figure three, and that it somehow disclaims a locking ring that performs that dual functionality as one of the problems in the prior art and a departure point for the invention. So it says that, well, because that's what the accused capsule does and that's what's disclaimed as the prior art, you cannot read the claims to cover it. It is an absolute gross mischaracterization of figure three. As we point out in our briefs, by both the express language of the headings and the legends within the figure three, as well as the specifications description of that, it is talking about a comparison between the known protrusions in the prior art and the elongated protrusions claimed and taught in the 267 patent. That has nothing whatsoever to do with the locking ring. Nothing. I want to mention briefly their file history disclaimer argument. There is absolutely no statement in the prosecution history, either uttered by the examiner or uttered by the prosecutor, that would allow them to make a file history disclaimer argument. In the absence of that, they interject their speculation as to what must have been the intent of the examiner. You cannot do that. There is no precedent that says you can do it. And even if you could, by very definition, it would not meet the doctrinal requirements for disclaimer. It is not clear, unmistakable, and unequivocal evidence of a disclaimer. All right. Thank you very much. Thank you. The case is submitted.